UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-CV-21192-JEM

JORGE A. AGRELO,
OLGA M. FERNANDEZ,
individuals,

Miami, Florida

Plaintiff(s),

August 17, 2018

vs.

THE MELONI LAW FIRM,
also known as Edoardo
Meloni, P.A., et al.,

Defendant(s).

Pages 1 - 48

---

HEARING
TRANSCRIBED FROM DIGITAL AUDIO RECORDING
BEFORE THE HONORABLE JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S): DAVID P. REINER, II, ESQ.
REINER & REINER, P.A.
9100 Dadeland Boulevard
Miami, FL 33156
(305) 670-8282
dpr@reinerslaw.com

FOR THE DEFENDANT(S): DALE T. GOLDEN, ESQ.
GOLDEN SCAZ GAGAIN, PLLC
201 N. Armenia Avenue
Tampa, FL 33609
(813) 251-3611
dgolden@gsgfirm.com

TRANSCRIBED BY: Joanne Mancari RPR, CRR, CSR
Court Reporter
jemancari@gmail.com

Thereupon,

the following proceedings were held:

THE DEPUTY CLERK: Calling case No. 14-21192, Civil, Martinez. Jorge Agrelo v. The Meloni Law Firm, et al.

THE COURT: Good afternoon, folks. Please be seated. Make yourself comfortable.

Happy Friday to all of you. Good to see you.

MR. REINER: Thank you, Judge.

THE COURT: Let's start off with appearances, starting first with the plaintiff.

MR. REINER: Judge, David Reiner, Reiner & Reiner, on behalf of the plaintiffs in this case.

THE COURT: All right. And is this --

MR. REINER: I'm sorry. I also have my client Jorge Agrelo is back behind me.

THE COURT: All right. Very well. Thank you very much.

For the defense.

MR. GOLDEN: Good afternoon, your Honor. Dale Golden for The Meloni Law Firm defendants.

THE COURT: All right. Very well.

So you made it. You had a little bit of a rough get going here.

MR. GOLDEN: American Airlines is aspiring to interrupt our relationship, Judge. It's two weeks in a row

that it's been a close call.

THE COURT: I have to tell you that there is an argument to be made that if you are coming from some other city in Florida to Miami -- Orlando, Tampa -- sometimes it's better to drive because by the time you get to the airport early, go through security, wait around and, in my experience, a lot of these flights, these commuter-based flights within Florida cities frequently get canceled or run late. So you put yourself through a whole bunch of aggravation and angst and you get jazzed up and you could have just driven.

MR. GOLDEN: Right. Yes. It's always because my partners tend to drive when they come down here.

THE COURT: Right.

MR. GOLDEN: I swear, I mean, it used to be a lot easier it seemed with Southwest. But I've never really had an issue and in the last two weeks American canceled my flight last week and this week. It was a relatively early flight in relation to when the hearing was, but it was delayed like an hour and 45 minutes. I thought it was -- it was delayed, delayed, delayed, and I thought the next thing it was going to be canceled, and then I was like --

THE COURT: Right.

MR. GOLDEN: Yes.

THE COURT: If it's from Orlando, that's doable. I think that's about three, three-and-a-half hours. Tampa might

be an extra hour and 15 minutes or something like that.

MR. GOLDEN: Yes. I mean, I have had to go up to Jacksonville, and Jacksonville, because the airlines are just habitually unreliable up there, that's usually a drive. It does. It ends up with the waiting time and everything, it ends up sometimes being a push.

THE COURT: Right.

MR. GOLDEN: And it takes out the uncertainty.

THE COURT: Then there is the drive back. That is a little bit of a drag having to drive back at 5:30 at night, another four-and-a-half, five hours. That is no fun. In any event, you are here. So that is good.

So, folks, this is, as we say in the business, an old case for us. I mean, it's a 2014 case. I understand that it was up on appeal for a while and stayed for a while. But nevertheless, it's still a four-and-a-half year old case. I think it was filed in early 2014.

I think you've got a discovery cutoff expiring relatively soon.

MR. REINER: Correct, your Honor. We got an extension, but it is expiring at the end of this month.

THE COURT: Right. Understood.

So have you folks been able to resolve any of the issues listed in your notice of discovery hearing from the time that it was filed on July 23rd until today? Anything get

worked out?

MR. REINER: Judge, we actually did have a number of conferences both telephonically and communications via e-mail. We probably were able to resolve, at least get responses, to about 40 of the requests for admission that we had. All of them originally had been objected to.

As far as the request to produce goes, what we got, we eventually ended up with after all of the back and forth was new, better, stronger objections to our requests to produce, but no -- and actually, I have got the magic envelope here of all the documents produced in this case by Meloni, which is empty, which is nothing, your Honor.

I didn't mean to be dramatic about it. I guess I did mean to be dramatic about it. We haven't gotten a single document from the Meloni law firm in this case and we weren't able to coerce them or cajole them or sweet talk them into giving us anything at all except for more objections.

As far as the interrogatories go, I know that there were probably two or three interrogatory answers that were actually amended to have answers rather than objections. Those were based on the fact that we did take a couple of depositions lately. And there were some things that came out in the depositions which made amending those interrogatory answers a good thing for Meloni to do. But we still have, the majority of them are still objections. They are still bound by the

objections.

Almost as importantly, this is the second time we've received interrogatory answers from the Meloni firm or from the defendants and neither of them have been verified. So we still have unverified responses.

THE COURT: So I don't necessarily need to know what matters have been resolved or which particular requests for admissions have been adequately responded to. All I need to deal with are the disputes.

So are there any disputes that you need a ruling on from me concerning the requests for admission?

MR. REINER: Judge, we did propound 180 requests for admission. As I said, there are probably 40 of them that got responses. The primary objections in the requests for admission were either there was -- requesting a legal conclusion about what --

THE COURT: I'm sorry for interrupting. I wasn't really looking for argument or background. I was looking for a very succinct answer.

So requests for admission. Most of them are still on the table for me.

MR. REINER: Correct.

THE COURT: 140 out of 180.

MR. REINER: Correct.

THE COURT: The requests for production, still on the

table because you have received not one document?

MR. REINER: Correct.

THE COURT: And then the interrogatories are also on the table as well.

MR. REINER: Correct, your Honor.

THE COURT: All right. So you are the quarterbacker of your own discovery hearing, so to speak. Which one of those categories -- the admissions, the request for production of documents or the interrogatories -- would you like to turn to first? And hopefully whatever you turn to first will be the most important for you, the ones that are on the top of your wish list.

MR. REINER: Let's then turn to the requests for admissions, your Honor.

THE COURT: All right.

MR. REINER: I'm sorry. The requests to produce.

THE COURT: Requests for production, yes.

MR. REINER: Would you like me to go through them one by one?

THE COURT: Well, I don't know. If there are certain categories in general that you think would be applicable to all of them, that might be helpful.

So, for example, how many requests for production are we talking about here?

MR. REINER: I think we have 35 or 36.

THE COURT: So you are not going to have time to go through 35 separate requests for production and responses and then for me to hear a response one by one from Mr. Golden. That would take up the rest of the afternoon.

MR. REINER: Right, your Honor.

THE COURT: And that would only be one category of discovery. That would be before getting to the interrogatories and the requests for admission.

So to the extent that you can present your dilemma in a broad way that covers more than one request or even categories of requests, that would be helpful.

MR. REINER: OK. What I can tell you is that a lot of the requests to produce were aimed at authenticating documents.

THE COURT: Are you talking about admissions or requests for production?

MR. REINER: For production.

THE COURT: All right.

MR. REINER: We wanted to make sure -- when we -- just to back up very quickly.

When we filed our complaint we received obviously an answer and affirmative defenses from the Meloni firm. The answer and affirmative defenses denied almost every factual allegation, including the authenticity of the documents attached to the complaint.

So when we went through and requested copies of the

actual documents, since they had denied the ones attached to the complaint were correct, then we got an objection.

In all those cases the objections were either these documents can easily be found by the plaintiff or through some other source by going to the Miami-Dade County court website and downloading them there, getting them certified or however.

So the request that we go to third parties to get documents then -- and these are documents that were produced, manufactured, created at the Meloni law firm. So that category of documents, everything in there, there's probably a third to half of the objections dealt with that category of documents.

Another category of documents --

THE COURT: Let's stop right there. So we are talking about category number one, documents prepared by the Meloni law firm.

MR. REINER: Correct.

THE COURT: And they didn't produce them to you. Instead, they just said go to other sources and find out for yourself.

MR. REINER: Either that or they said burdensome and harassing.

THE COURT: So what about that, Mr. Golden? Are you actually taking the position that the documents that your own client prepared the plaintiff must go to various web sites in order to get and you are not going to produce them? Is that

your position?

MR. GOLDEN: Of course not, Judge.

THE COURT: My gosh, we have a dispute as to what actually happened here.

Then what is your objection?

MR. GOLDEN: Well, I think, Judge, in order to -- here's my concern with this hearing today. If we go through any individual discovery requests at issue here, it might in the court's eyes not seem unreasonable. And I think that the problem --

THE COURT: What might seem --

MR. GOLDEN: The discovery requests might not seem unreasonable. But that would sort of exist in a vacuum, and I don't think it's fair to my client to view it that way because this case doesn't exist in a vacuum and this dispute doesn't exist in a vacuum.

So I think it is important from my perspective for the court to have a little bit more context in terms of what has gone on in this litigation that has brought us to this point today. And I understand that there are time constraints here, but like I said --

THE COURT: Well, there are time constraints because, number one, it is a Friday afternoon and I am not going to stay here until midnight. The other time constraint is that the discovery deadline is about to expire in about two weeks. And

the other time constraint is that the case is four-and-a-half years old.

MR. GOLDEN: Right.

THE COURT: And the other time constraint is, or overall issue is, you have produced apparently not one document in the case, which I have to tell you after four-and-a-half years -- I'm more than willing to listen to you -- but on the surface it sounds like a rather remarkable scenario, where a party hasn't produced one piece of paper. I guess conceivably that could happen, but I've been practicing law for 35 years. I don't think I've ever confronted a case where that's happened.

Now, maybe you took certain positions. You persuaded the court to enter summary judgment. That was reversed.

MR. GOLDEN: We did not. We weren't involved in that at all.

THE COURT: OK. But in any event --

MR. GOLDEN: That is why I think the context of this is important, your Honor.

THE COURT: That would explain the delay, but the point is you haven't produced one piece of paper in four-and-a-half years.

MR. GOLDEN: Which on its surface two-dimensionally, yeah, I get that. I can't say I can think of another case where that's happened. OK.

THE COURT: Yes.

MR. GOLDEN: That is why context is important.

THE COURT: All right. I'm happy to hear the context.

MR. GOLDEN: Thank you, your Honor.

Your Honor, this is, as you know, an FDCPA case, one of at least probably a thousand that are on the docket in this court, in this district court right now. The sum total of the allegations against my client are that he sent four letters to the plaintiffs. That's it. Four letters.

My client is a sole practitioner. He does work for homeowners' associations and property managers. He does some pre-litigation collection work. He does some lien foreclosure work. He does some other things as well, but that is the majority of his practice.

The sum total of the allegations in the complaint related to my client are these four letters that were sent. The letters on their face, and I don't know if you've looked at them, but on their face they are innocuous letters.

The dispute arises over a fine that there -- there was a disputed fine between Mr. Agrelo and the homeowner's association that my client was tasked to attempt to collect, and there are some disputes over late fees and things of that nature that were included in the letter, and perhaps attorneys' fees. OK. That is the sum total of this case with respect to my client.

We tried to resolve the case early. This is one of those cases where for me when I look at this case it goes in the pile of dump this case, it's not worth litigating because there's nothing here on either side. It's not a serious case in terms of the factual allegations.

That didn't work.

So in July of 2014 the plaintiff served 103 requests for admissions. We objected to 102 of them. Served 30 interrogatories. We objected to 19 of them. And served 27 requests for production. We objected to 23 of them.

The reason that's important is because when we objected to all of those we never heard a peep from the other side with respect to any of those objections, which to me is some sort of indication that they weren't all in love with their own discovery requests at that time.

THE COURT: I'm sorry. I have to interrupt you.

Are you telling me that you sent plaintiffs' counsel objections to the written discovery four years ago and it's never been brought to a judge for a discovery dispute until now?

MR. GOLDEN: No, no, no. That was the original round of discovery. We're not -- that was four years ago. We are now four years later and there was a whole new round of discovery, this 180 requests for admissions, which really, Judge, when you add in the subparts and the fact that it was,

here are a bunch of documents, answer this request for admission number one, which has two parts with respect to all 14 of these documents we're attaching. When you add in all that, it ends up being probably closer to 300 additional requests for admissions. And there were another 58 requests for admissions served last month.

What I'm saying is the initial round of discovery was similar to this round in that it was a bunch of discovery that we thought was completely improper, basically. The discovery requests were often indecipherable. They were not relevant to this case.

We interposed all of these objections and never heard a peep. I think that's important because, again, it demonstrates that the purpose of serving the discovery in our minds is something other than to obtain relevant evidence in this case.

We believe the purpose is to make life so miserable for us, to provide busy work for us, so that our client will capitulate to the plaintiffs' settlement demands in this case and settle the case.

THE COURT: As both of you are probably aware, here in the court we have a local rule that requires the discovery disputes to be brought to the court's attention within 30 days of the dispute arising. The reason for that is we don't want a case to go on for some extended period of time and the party

propounding discovery doing nothing to advance the discovery dispute and then at the eleventh hour, after the dispute has been in existence for months and months and months or years, suddenly pop up at five minutes before 12, so to speak, and say, aha, we have a discovery dispute. We are not going to entertain that kind of discovery dispute.

So the dispute that we are here on today -- I understand there is a history leading up to it, I understand there is an initial round of discovery and later discovery, but this particular discovery dispute that we are here on today, when did that dispute get teed up?

MR. GOLDEN: The end of last month.

THE COURT: All right.

MR. GOLDEN: And that's why I wasn't going down that road of saying that this wasn't timely, this hearing is not timely. What I'm saying is this is a continued history of what we believe are abusive discovery practices by the plaintiffs in this case.

I can tell you, Judge, that I haven't been practicing as long as you have, but in the 22 years that I've been practicing, and I handled a lot, substantially more complex litigation than this case, I've never gotten 103 requests for admissions in a case.

I understand that there can be cases where that would be necessary if it is a really huge commercial case or

something like that. This case is four letters from my client. The fact that we objected to 102 of them four years ago and never heard a peep, again, lends credence to the belief that it was pretty much pretextual.

THE COURT: But this latest round of discovery, the one that got teed up last month, is that the second round of discovery, the third round of discovery or some other round of discovery?

MR. GOLDEN: It's the second. What the plaintiffs did is they served the original discovery on my client's law firm, on the P.A., and then served the next round, especially with respect to the interrogatories, on him individually. Because then they could, at least for the interrogatories, get around the 30 interrogatory limit, I guess, by serving the firm as an entity and then serving my client individually in terms of the interrogatories.

THE COURT: So are any of the discovery requests in the second round, do they overlap the first round of discovery?

MR. GOLDEN: I think it depends on how you read them because, as I said, a lot of them are just -- I mean, frankly, they are very convoluted.

Just an example. As I said, the very first request for admission says: The PDF versions --

THE COURT: Right now I am talking about the requests for production.

MR. GOLDEN: That's fine. Again, I was just trying to sort of provide context.

When this case was filed in the spring of 2014, it was set for trial at the end of the year. OK. So we were on a pretty fast track there, and everything that needed to get done got done.

Mr. Reiner had an opportunity and took the depositions of all three defendants' corporate representatives. There was never a dispute during any one of those depositions regarding any of the 25 exhibits that were attached to the complaint, which included all the letters from my client, all the letters from Mr. Reiner's client, the Marbella deed restrictions, which are one of the main documents, apparently, at issue in this case. So there was never during any of those depositions anything other than an acknowledgment that, yeah, that's the document.

THE COURT: I'm sorry. Let me make sure that I have a complete feel for how this unfolded.

The first round of discovery four years ago, requests for admissions, interrogatories and requests for production were sent to the law firm.

MR. GOLDEN: Correct.

THE COURT: You raised a myriad of objections.

MR. GOLDEN: Correct. We objected to the overwhelming majority.

THE COURT: Fair enough.

The plaintiff never did anything about those objections?

MR. GOLDEN: Correct. We never heard a peep.

THE COURT: Never heard a peep. All right.

Life unfolds as it normally does. There is a summary judgment ruling. I realize not relating to your client. It goes up on appeal. It is reversed. The Appellate Court says this is in fact covered by the statute, this is kind of a debt and debt collector that is covered, and that was about two years ago, a year-and-a-half to two years ago.

MR. GOLDEN: November 2016, your Honor.

THE COURT: Fair enough.

So then there is a new round of discovery that goes out within the past two months or so and that is targeting only the individual defendant, the attorney Mr. Meloni, correct?

MR. GOLDEN: Correct. You are right.

THE COURT: And there is some overlap between the first round and the second round.

MR. GOLDEN: Yes. I mean, given the limited scope of this case, it's inevitable that there would be. Like I said, it ends up being somewhere in the neighborhood of 500 requests for admission, if you include all the subparts, and around 60 or so document requests and pushing 60 interrogatories as well.

So it's inevitable that there's overlap because

there's just not much there. There just really isn't. It's four letters.

THE COURT: OK.

MR. GOLDEN: So, yes. So there are depositions taken. There were never any disputes over the authenticity of any of the documents during any of the depositions.

We filed two dispositive motions in December of 2014. The codefendants did file summary judgment arguing that the fine wasn't a debt. Frankly, I never believed that was a strong argument so we didn't join it or anything. We stood on the sidelines of that.

When we came back on appeal, by the time this case went on appeal -- just to be clear, there were 169 docket entries in this case. The Reyes case has 159 total in that case. There were 169 at the time of the appeal. The overwhelming majority of the docket activity related to various motions that the plaintiffs filed. They filed more than a dozen non-dispositive, contested motions. Six motions to strike, six motions for reconsideration. Three of those motions were summarily stricken as violative of the court's scheduling order. The rest of them were denied basically for the same reason or just summarily denied. That's what the tenor of this case has been.

We were ready to go. We were completely done with this case at the end of December 2014. We had a pretrial stip

that was filed. Everyone was on the same page in terms of the pretrial stip. And then the case went up on appeal.

Since the case has come back from appeal -- I said there was 169 when it went up on appeal. The case was completely ready for a trial at that time obviously. It came back down on appeal. There have been 100 more docket entries since the case came back on appeal.

Now, Judge Martinez hasn't ruled on either of our dispositive motions yet. Instead, what he did earlier this year is he entered basically what I would say is the equivalent of, we're at the beginning of the case, sending out an order saying you all need to file a joint scheduling report. We got together and disagreed on that because I didn't want any additional discovery in this case because we were ready to try the case three-and-a-half, almost four years ago. But Judge Martinez said you can do additional discovery.

So he gave like a two-month window for additional discovery, and that's when we got this second round of discovery that includes all of these discovery requests that we're here on today. In addition, like I said, I think right at the end of last month we got at least 58, I think, more requests for admissions and 30 more interrogatories. No. Maybe it is only like two interrogatories or two requests for production, again, directed at the defendants in this case.

So from our position, Judge, as I said, at the end of

2014 this case was absolutely ready for trial. It got pushed back twice just because we sort of ran out of time in terms of dispositive motions and things of that issue. But the case was done. It was in the can. It was ready to go to trial.

What's happened in this case, as I said, is it's been over-litigated. It's been over-litigated since the inception.

I can say this. I have never had a case that I handled, and I have had more than a thousand of these cases, more than 300 of them in this district, I've never had a case that's been as over-litigated as this case has been. We are at 269 docket entries in a case that, against my client, involves four letters, against the two codefendants involves a fine.

So that's where we are in this case. That's why it's important for us to look at these discovery requests in the context of that bigger picture, and then in the context of many of the discovery requests themselves that are just -- that are, again, like nothing I've ever seen before in terms of parts and subparts and definitions and syntax and grammar and stuff like that in terms of trying to figure them out.

OK. It is not our practice to sit and blanketly oppose discovery. I have had several cases with Judge Martinez where you have been a paired magistrate and I have never had a single discovery hearing. I've never had a discovery hearing I don't think in the Southern District here. Have we had discovery disputes in cases? Certainly. But I think if I

litigate ten cases, 20 cases, I have a discovery dispute in one of them. This case is the exception to the rule, and it's not -- the picture here that's being painted is that, gee, they didn't produce one single document in this case and therefore they must be doing something wrong. That's just not the way it is.

The reality is those four letters are the heart and soul of the case. Mr. Reiner's office has gone out and collected all kinds of documents from the public records, including liens that were filed by my client, and used them at deposition. There's been no indication that, gee, we need to take Mr. Meloni's deposition again because there's been new evidence that's been discovered since we started this case four-and-a-half years ago.

The reality is that the overwhelming majority of these discovery requests in our mind are nothing but efforts to create busy work on our part. We have spent, just since we served the discovery requests and have been trying to work through this and trying to get it resolved, one of my partners and I have spent probably close to 50 hours trying to amend responses on the phone with Mr. Reiner. One of the biggest things is -- you know, I'm kind of like your Honor. You said let's try to get sort of big picture, what do you need here, because we don't have all night.

I sent Mr. Reiner an e-mail saying, listen, what are

the nuts and bolts here, what are you looking for, because if I can resolve it that way, that's what I want to do. I want to get to the end and say what do you need that you don't think you have and tell us what that is and see if we can resolve that.

I thought he'd come back and tell me, which is what I usually get is, this is what I'm looking for, these five things. OK. Well, let me talk to my client and we'll get back to you.

We got a two- or 300-page single-spaced legal memorandum that did nothing but provide support for his argument that all of our objections were garbage. I mean, there were cases from courts throughout the United States in this memorandum.

Like I said, my partner and I sat down seven hours one day to get through it with relation to the requests for admissions. This is not some situation where we were just sitting back and saying let's just send out our boilerplate objections and we will go to a discovery hearing and everything will be fine. That is not what happened here. That is not what we do. That is not how this case has proceeded.

We were the ones that have been saying this is a simple case. We filed our motions, our dispositive motions. Once we get to the other side of them, even if we win them all, there will be a couple of minor technical issues that remain.

We just want to get to the end of the case. I mean, after the case came down on appeal, it was my office that said, hey, let's have a settlement conference in this case, and we had a settlement conference with your Honor right here in this courtroom in March of last year. It was almost a year and a half since that settlement conference.

So this is not a situation where we're gaining some sort of benefit by dragging this out and inserting these baseless objections. I mean, we take this seriously. And when people start lobbying terms like we're being unprofessional, that's stuff that we take seriously. We're not unprofessional. We're trying to defend our client the best way we know how, and that's all we've done in this case.

These discovery requests, again, if you look at one or two of them or ten of them or 15 of them, in a vacuum you could say, well, that seems reasonable. But when you look at the totality of them, in some of them there is no reasonable basis for them, there is no reasonable basis for a discovery request that says please give me copies of all documents attached to the complaint.

THE COURT: So let me ask plaintiffs' counsel, why are you entitled to all the communications that Mr. Meloni, his law firm, sent to other homeowners in completely unrelated situations?

I mean, you represent one plaintiff in this case

concerning one piece of property. Why are you entitled to all of this discovery concerning an unlimited number of other demand letters and collection activities for other matters? Explain that to me, please.

MR. REINER: I'm glad you characterize it as collection activities, your Honor, because the problem that I have from the get-go in this case has been that I have answers to a complaint that say I'm not a debt collector, I'm not a debt collector. So that leaves me with the absolute obligation to try and prove that he's a debt collector. And how do I do that? Can I do that with my four letters or five letters? There is no way to do it with that. There is no way to do it with objections being taken at deposition. The only way to do that is to quantify it. And I'm trying to quantify it.

So I'm asking for all of the activity -- and I restricted it to Marbella Homeowner Association. I know that Mr. Meloni and their firm do a lot of associations. I didn't ask for a broadbrush of things. I restricted it to time, the two-year relevant time period that we're talking here when the dispute was going on.

Everything that I did was to try to make it as restricted as possible to be able to get to the goal that I have, which is to prove that he's a debt collector, which is my obligation under both statutes on the claims that I've brought. So that's that particular issue in a nutshell. But it goes to

every other single issue in this case.

If they had sent a response to the complaint that was fair, that we admit that he was a debt collector, that we admit this, that, or the other thing, we deny of course that there was any violation of the statute, I mean, you could do that. But to deny everything in the answer to the complaint, that left me with no other alternative than to try and prove all of those things.

THE COURT: So this particular association, Marbella, give me a feel for the size of that.

MR. AGRELO: 385 properties, your Honor.

THE COURT: So is it an apartment complex?

MR. REINER: Homeowners' association.

THE COURT: So it is a individual, single-family homes?

MR. REINER: Correct.

THE COURT: With a name called Marbella.

MR. AGRELO: Right.

THE COURT: 385 homes.

So if you have in fact denied that Mr. Meloni and his law firm are debt collectors or are involved in debt collecting, what would you have plaintiffs' counsel do? Just say, oh, well, they have denied it, I'm going to just limit my discovery to these four letters.

MR. GOLDEN: Of course not. He is entitled to take

discovery on that.

THE COURT: All right.

MR. GOLDEN: Again, the case was ready for trial at the end of December 2014, and I wish -- one of my regrets sitting here right now is that I don't have the pretrial stipulation in front of me. I could be wrong about this, and I'll say I could be wrong about this, but my guess is that the concept of Mr. Meloni meeting the definition of debt collector under the FDCPA was not going to be an issue for trial in this case.

THE COURT: I'm sorry. Fortunately we are going to be able to track that down. Let's take a look, please. Let's get the docket sheet up there and let's take a look.

MR. GOLDEN: It's 108.

THE COURT: Let's go to ECF-108. That's the pretrial stipulation. Let's doublecheck. We'll see.

MR. REINER: And, your Honor if I may --

THE COURT: Not yet, please. I'm thinking and I'm looking.

Pretrial stipulation is 108. Let's print that out, please.

THE DEPUTY CLERK: Do you want the exhibits?

THE COURT: No, just the stipulation, because that will identify whether that is an issue or not.

You are saying the printer is slow? This computer?

Well, that is not acceptable. Isn't it a laser printer?

(Pause)

THE COURT: So while we are waiting for this to get printed out -- I hear a noise. Maybe it is getting printed out now.

(Pause)

THE COURT: So the pretrial stipulation doesn't exactly contain the magic phrase is Mr. Meloni and/or his law firm debt collectors. But there are many issues under the disputed issues of law which sort of dance around that issue.

For example, whether Meloni's letter dated August 9, 2013 falsely represented the character, amount or legal status of plaintiffs' debt; whether Meloni's letter threatened to take action that could not legally be taken, in violation of 15, United States Code, Section 1692e(5); whether his letter used any false representations or deceptive means; whether his letter -- this is No. M -- whether his letter attempted to collect any amount not expressly authorized by the agreement, created the debt, or permitted by law; whether his letter -- No. N -- whether his letter attempted to collect any amount not expressly authorized by the agreement; whether his letter failed to include certain statements which would be required; whether his letter or letters in several other respects allegedly violated various statutes designed to protect consumers; whether a letter attempted to enforce rights that

Meloni knew that the debt was not legitimate, etc., etc., etc.

So the exact question was Mr. Meloni or his firm engaged in collection activities wasn't specifically listed, but it seems to me that that is sort of a fundamental issue underlying about two or three dozens of these other subissues listed here in the pretrial stipulation.

So, Mr. Golden, you are sort of the master of your own discovery responsibilities. If the plaintiff asserts that your client is involved in collection activities and you say, no, he's not, plaintiff should be entitled to propound discovery to see whether he is or he isn't. Wouldn't you agree?

MR. GOLDEN: And he did. He took my client's deposition and he sent out discovery back in June, July of 2014.

The other thing I'm at, your Honor, as I was talking earlier about cut to the chase, these five things, if he had said last month, OK, well, I need -- I don't believe that your discovery responses have been sufficient, I directed these toward the element of the claim that your client is a debt collector, at that time -- today, right here in this courtroom, I will tell you we stipulate that my clients are debt collectors for FDCT and FDCPA purposes.

THE COURT: But that is not what you said in the answer. Apparently, according to the plaintiffs' counsel, you denied it.

MR. GOLDEN: If there is an allegation in a complaint that says defendant is a debt collector as defined by the FDCPA, I don't think that is an appropriate thing to be put in a complaint because it's not a fact; it's a legal conclusion. I think we can deny it on that basis.

But again, I don't think that there has ever been a legitimate issue in this case, because I've had that in certain cases.

THE COURT: Listen, here's what we are going to do because, quite frankly, I have a lot of other cases and a lot of other issues. I cannot, gentlemen, spend hours and hours -- Mr. Reiner, you are more than welcome to chat it up with your client or you can listen to me.

MR. REINER: I apologize, your Honor.

THE COURT: What is your preference?

MR. REINER: You, your Honor.

THE COURT: So in any event, I don't have hours and hours and hours to go through dozens and dozens of multipart, discrete discovery requests. I simply don't have the time. Especially between now and when the discovery period ends. I have got dozens and dozens of other cases, none of which, quite frankly, involve the magnitude, volume, and breadth of discovery in this case.

But Mr. Golden just said on behalf of Mr. Meloni, the lawyer and his client, The Meloni Law Firm, they will stipulate

that both of his clients are involved in debt collection activities for purposes of those two statutes. Correct?

MR. GOLDEN: We will not contest the issue that their activity falls under the purview of this case. However, you want to word it. It is a stipulation. It's not an issue for us.

THE COURT: So you will file that stipulation on the record by Monday.

Therefore, all of the discovery that you have propounded that you say, gosh darn it, we had to propound that discovery to get to the bottom of that issue, all that is now off the table because you no longer have that need. So let's see if we can't eliminate major swats of other discovery based on stipulations or concessions.

What are the primary goals you are seeking to achieve with all of the remaining discovery?

MR. REINER: There are two primary goals left. One is to, first of all, to be able to authenticate documents so I don't have to bring in corporate reps for trial. I want to be able to authenticate the documents, and I can do that through stipulation.

THE COURT: Let's stop for a second. Are you seeking to authenticate documents that were attached to your complaint as exhibits?

MR. REINER: That's number one.

THE COURT: Number one. And the other side has refused to admit the authenticity?

MR. REINER: Correct.

THE COURT: And you are making a gesture. I don't know you well enough to understand what that hand gesture and body language means.

What message are you communicating?

MR. GOLDEN: He deposed Mr. Meloni and he put all of the letters in front of him and he identified them as his letters. There are 25 exhibits to the complaint. I don't know what all of them are as we sit here.

But there's no dispute regarding the authenticity of any of the letters that my client sent that are -- as to the complaint, any of the letters that the plaintiff sent that are attached to the complaint or the Marbella whatever you want to call them, the bylaws, which I think are Exhibit, I don't know, Exhibit F to the complaint. I'm not even sure. OK.

THE COURT: So let me just make sure I have this down.

Jenny, hopefully you are taking notes of all this.

You are saying any letters sent by Mr. Meloni.

MR. GOLDEN: Right.

THE COURT: Or his law firm.

MR. GOLDEN: Right.

THE COURT: Or the Marbella bylaws.

MR. GOLDEN: Right.

THE COURT: You are agreeing to the authenticity.

MR. GOLDEN: Yes. It's all been testified to, so yes.

THE COURT: And when you mean letters by Mr. Meloni, do you mean just to Mr. Agrelo in this case or to any Marbella homeowner?

MR. GOLDEN: Well, I mean that -- I guess my only concern with that is -- I don't want to be a smart alec and say, well, to the extent they are actually my client's documents. If you tell me there's a box of documents sitting on the floor and they are all letters that my client sent to somebody, I assume so. I mean, there's not going to be a dispute about any of those sorts of things because, frankly, from my position none of it matters. OK. So that's the thing. It's all --

THE COURT: So let's take it a step at a time. Are you challenging the authenticity of any of the exhibits attached to the complaint?

MR. GOLDEN: Again, there are 25 of them. I'm thinking probably not, but I don't know what all 25 are as I sit here.

Certainly the four letters that my client sent, all the letters that Mr. --

THE COURT: Well, if the discovery was limited to just the four letters, we wouldn't be here. So we're here because the discovery covers way more than just the four letters.

So I am trying to make it easy. There are 25 or approximately 25 exhibits attached to the complaint. You are either challenging the authenticity or not. If you are not, whatever discovery is propounded to obtain a concession is no longer necessary because you've stipulated to the authenticity.

MR. GOLDEN: Fine.

THE COURT: If, however, you are saying oh, by gosh, we want to preserve our rights, we're not going to make a concession, we're not going to admit it, then plaintiffs' counsel logically is propounding those requests for admissions.

MR. GOLDEN: We will not challenge the authenticity of any of the exhibits to the complaint.

THE COURT: All right. So that is on the record now.

Mr. Reiner, you have that on the record to the extent that you ever need it, but I'm sure Mr. Golden is not going to backtrack from that.

So all discovery designed to probe the authenticity of any exhibit attached to the complaint is now beyond the scope of discovery because the two defendants, Mr. Meloni and his law firm, have agreed to the authenticity.

OK. So what about all the exhibits that you showed Mr. Meloni at his deposition? Is the defense agreeing to the authenticity -- not the relevance, just that it is a fair and accurate copy. Are you agreeing to the authenticity of the exhibits used at Mr. Meloni's deposition?

MR. GOLDEN: My only hesitation, Judge, is that was four years ago. I don't remember as we sit here what they were, and I reviewed his deposition transcript before we came in here but not the documents themselves. I don't think there were very many of the documents.

I guess my overriding thing in this case is, I don't think there is a factual dispute about anything in this case. One of the things that the plaintiffs are going after is the concept that certain divergent late fees were charged at different times in different documents or sought in different documents, for example. And again, the documents themselves show this beyond a doubt and documents that are authentic documents and that have been testified to at deposition, that at times late fees were charged at $25, at times they were charged at $11.50, and I think at times they were charged at $10. We don't dispute that at all. I mean the testimony on that issue has been very clear. But that seems to be some sort of, I don't know if I'd call it a factual dispute but an area of focus in this case.

I mean, the meaning of that is a different issue, but the fact that different documents have different late fees in them and those documents were filed by Mr. Meloni or letters sent out by his office, things of that nature, we don't dispute that because the documents clearly indicate that.

Again, I'm not afraid of that fact at all. I just

don't think it's relevant. So I mean that's sort of one of the other overriding issues in this case based upon the depositions that have been taken in the last three weeks. So that issue, I'm not afraid of that issue. I'm willing to stipulate that the documents are accurate.

The documents that he put in front of the last two deponents, Ms. McDonald and Ms. Bohannon, that includes some of these documents that are unrelated to Mr. Agrelo, we don't dispute the authenticity of any of this.

THE COURT: So let's go to the next category. All documents used as exhibits at the depositions of who? Who are the two people that you said?

MR. GOLDEN: Alexis McDonald.

THE COURT: Alexis McDonald.

MR. GOLDEN: And Jami -- it's J-A-M-I -- Bohannon.

THE COURT: Spell it.

MR. GOLDEN: B-O-H-A-N-N-O-N.

THE COURT: OK. So the defendants --

THE DEPUTY CLERK: I'm sorry. B-O-H-A-N-N?

MR. GOLDEN: O-N. Bohannon.

THE COURT: So Mr. Meloni, his law firm, your clients, are agreeing to the authenticity of those deposition exhibits?

MR. GOLDEN: Right. And any --

THE COURT: So therefore, any discovery requests concerning the authenticity of those exhibits are now

irrelevant and unnecessary and beyond the scope of discovery because you've already stipulated to it.

MR. GOLDEN: Beyond that, your Honor, any of the documents that my client filed in public records -- the liens, any foreclosure actions he filed, any of those public record documents -- we don't dispute those either.

THE COURT: All right. So any public record documents filed by Mr. Meloni --

MR. GOLDEN: Right, or the firm. Right.

THE COURT: -- filed by Mr. Meloni or the firm you are not challenging the authenticity.

MR. GOLDEN: Correct.

MR. REINER: Judge, if I may.

THE COURT: Yes.

MR. REINER: The issue of forcing my client to go to a third party to get documents and then to get certified copies of documents or what, I think that's a problem for us.

I agree that -- first of all, these are documents that they produced, they generated, they created. They have them in their files. They probably have PDF files of them. If we have to go and search for all the documents and pull them out of the clerk's website -- and I guess what he's doing is he's saying he won't object to the authenticity. I don't need to have them certified? I don't need to have certified copies?

THE COURT: That is what it sounds like to me.

MR. GOLDEN: If they are public record documents the clerk can take judicial notice of them. So yes.

THE COURT: Listen, lawyers are by training and personality a little nervous and leery and they want to make sure that they are not exposing themselves to an issue. So they want to nail everything down.

So Mr. Reiner is saying, wait a minute, I want to make sure that if we have a trial, whatever documents Mr. Meloni or his law firm filed in the public records, we don't need to have a certificate of authenticity or certified copy from the clerk's office. You will agree to the authenticity of those documents.

MR. GOLDEN: Right.

THE COURT: Therefore, a records custodian is not necessary, a certified copy is not necessary. You can of course reserve for yourself other objections like relevance, but that's not what Mr. Reiner's worried about right now. He's worried about the logistical procedural headache of having to track down a certified copy or otherwise getting authenticated copies.

So if you are saying not an issue, our stipulation is broad enough to cover those, then that discovery is off of the table as well.

Are you willing to make that concession?

MR. GOLDEN: Right. I'll say it again. Any documents

that my clients filed in the public records as part of a charging lien, if it is a lien or foreclosure action, it is public records and it would be subject to judicial notice anyway. So yeah, we are not going to fight any of that stuff.

THE COURT: Not to be OCD and neurotic about it, but when you say we are not going to challenge it --

MR. GOLDEN: Right. We will stipulate to the authenticity.

THE COURT: -- you will stipulate to the authenticity and therefore Mr. Reiner doesn't need to get certified copies or other authentication-type documents.

MR. GOLDEN: Correct.

THE COURT: All right. So therefore, whatever discovery was propounded to confirm the authenticity of those documents is no longer necessary. As I've indicated, you and your clients can still interpose objections on relevance or other grounds.

(Pause)

THE COURT: We have a 5:30 hearing. People will be floating in. So we may need to take a break for a little while to hear this other hearing.

MR. REINER: If I can just interject one thing. You guys made me very nervous about American Airlines and I have an 8:30 flight out of here to LaGuardia tonight on American Airlines and --

THE COURT: Yes.

MR. REINER: -- it's for a funeral tomorrow morning. It was a last-minute thing. I do not want to push this off in any way for that. So if I can get out of here by 7:00, I have my bag packed and ready to go straight there on the train.

THE COURT: That is not going to be an issue because I'm not going to be here at 7:00 tonight.

MR. REINER: OK.

MR. GOLDEN: My flight's at 7:45.

THE COURT: So you are not going to be here either. Your flight is not going to be showing up, I predict, anyway because that is just your track record today to date.

All right. So now let's take a look at some of these interrogatories, because I have to tell you, Mr. Reiner, it appears to me that these interrogatories are frequently multipart interrogatories which, if you count them up, are well in excess of the limit. Each question is almost like a mini-deposition. I mean, you're asking multiple, multiple questions.

So I think that Mr. Golden has a viable objection that you are over the limit. But the other fundamental question I have is, didn't you already pretty much get answers to these interrogatories through the deposition of Mr. Meloni?

MR. REINER: We probably got a lot of them, your Honor. Again, most of these depositions or the interrogatories

were geared toward trying to authenticate documents. We produced documents with our discovery and asked them to look at them and answer questions about them.

THE COURT: Right.

MR. REINER: We also did -- I know there is the issue that came up after I had served interrogatories about whether or not the subparts generated more than the allowable limit. We withdrew several of the interrogatories that were multipart like that just to avoid that argument, but it didn't seem to work. We still got that argument.

THE COURT: Right. But here's my point, and this comes up in a lot of cases. Lawyers will propound interrogatories and they will be somewhat fact specific and they will be somewhat complicated and there will be a dispute, and my typical response is often, listen, let's be realistic. Wouldn't you rather get an answer to these interrogatories under oath in a deposition where you have the ability to probe, to ask followup questions, to clarify, to have a give-and-take dialogue and conversation, rather than to rely on an interrogatory answer which is going to be crafted by a lawyer, which is going to be worded in a very precise answer, which at times is designed to be as narrow a response as possible. It eliminates the ability to ask followup questions. If the interrogatory is phrased even in a slightly inartful way, then the response that you get in the interrogatory answer is not

going to be particularly helpful.

So I always say take a deposition and get the information.

So, for example, if there's a case where somebody slips on the deck of a cruise ship and the defense propounds an interrogatory that says, please explain how you fell. OK. I guess a lawyer can craft a five-sentence answer, but you are much better off getting the answer from the plaintiff himself or herself in a deposition that lasts an hour or two or maybe even all day where you can ask followup questions.

So if you've already taken Mr. Meloni's deposition, and I assume you've asked the relevant questions, you've already gotten your answers. To the extent that these, that some of the interrogatories were designed to authenticate documents, I think you've already got the authentication issue over with through these stipulations that Mr. Golden has made. Don't you think?

MR. REINER: As to probably most of the documents that we were talking about authenticating I think that's probably true. Remember, all the requests for admissions, most of them had to do with authenticating documents.

THE COURT: Right.

MR. REINER: So there may be others that I still need to talk to Mr. Golden after this hearing about maybe stipulating to so we can take them out.

THE COURT: Right.

MR. REINER: Because I don't want to have a seven-day trial for four or five letters. I don't want to have that.

THE COURT: Listen, I can assure you that Judge Martinez is not going to give you a seven-day trial over four letters. That is not happening.

MR. REINER: I know, your Honor. I was just pontificating.

THE COURT: All right. I understand.

MR. REINER: But --

THE COURT: But, listen, we are going to have to take a quick break because it is now 5:28, these lawyers are on the phone probably calling in.

You can remain seated. You don't need to leave because the lawyers are is not coming into the courtroom. They are going to be on the phone. So just relax. Maybe you can even make some good use of the time and go in the hallway and try to hammer out whatever lingering issues there are because I think maybe there's just been a lack of communication or maybe each side kind of dug in.

But Mr. Golden is willing to make stipulations and concessions and avoid discovery hassles on issues that he thinks aren't relevant anyway. So see if you can't spend a few minutes in the hallway trying to resolve any lingering issues and then I'll call you back in in a few minutes after this

other hearing is over and then we will be able to get everything wrapped up and you will be able to make it to the airport. OK?

MR. REINER: Perfect.

THE COURT: All right.

MR. REINER: Thank you.

THE COURT: Thank you so much.

(Recess)

THE COURT: So, folks, back to 14-21192, Agrelo v. The Meloni Law Firm, etc.

In the past, gosh, half hour, were you folks able to make any headway?

MR. REINER: Judge, we did actually have some discussions about the interrogatories and about other documents that maybe we can come to some kind of a stipulation on.

Obviously I think Mr. Golden and myself want to try and streamline the process both in discovery and for trial. As your Honor has said, we won't be able to do our seven-day trial.

The interrogatories, probably half of the interrogatories relate to documents that are part of stipulations. So I would like really -- I know that we propounded interrogatories right after Mr. Meloni's deposition was taken, so there was some reason for us propounding them. Again, time has gone by and my memory is not as good as it once

was.

Also I will tell you that the number and I guess complication of the interrogatories, I'm a lousy chess player. It takes me 15 moves to get to checkmate whereas somebody else can do it in eight. We will try and narrow those down so we can come to some kind of a resolution on the remaining discovery issues in the interrogatories as well as the admissions. I'll look through those as well.

What I would like to do -- and we would like to do it fairly quickly. So I guess sometime early next week, if that's OK. And then just try and see what your Honor wants as far as an end game goes. Do we bring back any issues to your Honor or should we file a motion to compel on those issues? How do we deal with that?

THE COURT: So I predict that the end game will be you will not need any further guidance from me. I think you will be able to work it out because you have already made significant progress in working out many of the discovery disputes and I'm confident you will be able to work out any remaining issues.

But if for some reason there is still a few matters that have not been resolved and you need a ruling from me, I don't want you to file a motion. It is sort of inconsistent with my calendar discovery practice.

Normally what I would say is just set it down for

another discovery calendar hearing. The problem with that is you have got a discovery cutoff in about two weeks.

MR. REINER: Right.

THE COURT: Number one, Mr. Golden has to travel all the way from Tampa to be here and even if his plane is on time, it's still a pretty major undertaking.

MR. GOLDEN: I'm driving.

THE COURT: Well, perhaps. Here is what I am willing to do. But I hope that you don't take advantage of this offer. I'm sure you won't. I am willing to have a telephone hearing to resolve any lingering discovery disputes, but I would like you both to give your best efforts to streamlining the discovery and getting it resolved, especially in light of the concessions that the defendants have made as to the authenticity of documents.

I hear what you are saying about not being an efficient chess player. I don't object if in the next couple of days you decide to switch to checkers. It will be OK. I think you will be able to work whatever you need to work out on your own. As I say, if not, just call up chambers, speak to my law clerk Jenna Fishman, she will know the case, and we will try to set it down for a quick telephone hearing to issue any rulings that are necessary.

OK.

MR. REINER: Can I also ask that you just defer on any

ruling as far as fees or costs go?

THE COURT: Yes. We will. All right.

MR. REINER: All right.

THE COURT: Very well. Good to see you all again. I do remember the mediation. I didn't realize it was that long ago.

THE DEPUTY CLERK: He has a flight.

THE COURT: Yes. I understand. Your flight is at 7:45?

MR. GOLDEN: Yes. It's supposed to be. It will be like 8:30 or 9:30.

THE COURT: Anyway, you folks are certainly welcome to skedaddle out of here. We will issue a written post-hearing administrative order just sort of summarizing the concessions and the stipulations and the other rulings.

Good to see you, folks.

MR. REINER: Thank you, your Honor.

MR. GOLDEN: Thank you, your Honor.

THE COURT: Safe travels back to Tampa and --

MR. REINER: LaGuardia.

THE COURT: -- LaGuardia. Is that right?

MR. REINER: I have to go up to Connecticut for a funeral tomorrow.

THE COURT: Oh, gosh. I'm sorry. Normally you are based in Dadeland.

MR. REINER: A train ride downtown.

THE COURT: Right. OK. Be well.

MR. REINER: Thank you, Judge.

THE COURT: Bye now.

(Adjourned)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription to the best of my ability of the digital audio recording in the above-entitled matter.

September 7, 2018

s/ Joanne Mancari
Joanne Mancari, RPR, CRR, CSR
Court Reporter
jemancari@gmail.com